112

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3   VERA CHAPMAN and          ()        CIVIL ACTION
     KRYSTAL HOWARD            ()        NO. H-11-3025
 4                            ()
     VS.                      ()
 5                            ()        HOUSTON, TEXAS
     ASUI HEALTHCARE AND       ()        NOVEMBER 6, 2012
 6   DEVELOPMENT CENTER, ET AL ()        9:09 A.M.

 7
                     TRANSCRIPT OF BENCH TRIAL
 8            BEFORE THE HONORABLE GRAY H. MILLER

 9                    VOLUME 2 OF 2

10

11   APPEARANCES:

12   FOR THE PLAINTIFFS:    Mr. Mark Siurek
                            Ms. Patricia Haylon
13                          Warren & Siurek, LLP
                            3334 Richmond Avenue, Suite 100
14                          Houston, Texas  77098

15   FOR THE DEFENDANTS:    Mr. Joseph R. Willie, II
                            Attorney at Law
16                          4151 Southwest Fwy, Suite 490
                            Houston, Texas  77027
17
                            Ms. Lori Chambers-Gray
18                          Ms. Stacy M. Allen
                            Law Offices of Lori Gray & Associates
19                          11500 Northwest Fwy, Suite 410
                            Houston, Texas  77092
20
     COURT REPORTER:        Anita G. Manley
21                          Official Court Reporter
                            515 Rusk, 8th Floor
22                          Houston, Texas  77002

23

24   Proceedings recorded by stenographic means, transcript produced
     by computer.
25
```

113

1                              <u>I N D E X</u>

2

3

4

5

6
Plaintiffs rest----------------------------------------121
7

8

9
                        Direct  Cross  Redirect  Recross
10
VERA CHAPMAN                                              121
11

12

13
Defendants' motion for directed verdict----------------125
14

15

16
                        Direct  Cross  Redirect  Recross
17

18
DIANN SIMIEN             132     138     151
19
KRYSTAL HOWARD           154
20

21

22
Defense rests------------------------------------------157
23

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right.  Are we ready to proceed?

3          MR. SIUREK:  We are, Your Honor.

4          THE COURT:  All right.  Let's address the summary

5    documents, which I think are Exhibits 15 and 16.  Correct?

6          MR. SIUREK:  They are, sir.

7          MR. WILLIE:  Yes, sir.

8          THE COURT:  Okay.  I've looked through what you filed,

9    and I've taken a look at the law in this case.  Mr. Siurek,

10   these are your exhibits, so I'm going to let you say whatever

11   you'd like to say about them.

12         MR. SIUREK:  Again, Your Honor, without regurgitating

13   the brief, I think the analysis -- and perhaps, yesterday I was

14   very inartful.  So, I believe what I was trying to get across

15   to the Court was the legal standard in the Fifth Circuit is

16   very different than what Mr. Willie was quoting to the Court

17   yesterday.

18              The Fifth Circuit generally only requires two

19   factors: that the evidence previously admitted is voluminous.

20   That's already been met.  I think we agreed all the underlying

21   evidence has been admitted.  And a review would be

22   inconvenient.  That was the first issue, is the legal standard.

23              I think, secondly, what the Court was inquiring

24   about was the foundation or the actual basis to get the records

25   in.  So, we went back to the law, and that's where the *Jennings*

1   case is instructive.  It says the proper method -- excuse me.

2   I don't want to misquote.  "One proper method for laying a

3   foundation for the admission of summary charts is simply to

4   admit the documentation on which the summary is based," which

5   is exactly what's occurred here.

6           All of the underlying information in 15 and 16 is

7   based on the documents that have been admitted previously.  And

8   only when that information is missing has it been augmented

9   with testimony that's been admitted into evidence.  That's all

10  that those summaries comprise.

11          THE COURT:  All right.  Mr. Willie.

12          MR. WILLIE:  Judge, we cited to you the *Buck* case, and

13  they use the real Latin word, pedagogical.  That's exactly what

14  it is.  The Fifth Circuit parrots the Sixth Circuit.  There's

15  five criteria he has to meet before those summaries can be

16  admitted.  He doesn't meet three of the five of the criteria.

17          The last one is the most important one.  That

18  testimony has to be introduced by the person who prepared the

19  summary.  Ms. Chapman can't do that.  Ms. Howard can't do that.

20  He has no witness who prepared the summary to do that.  They

21  asked the attorneys even if they prepared the testimony.  They

22  have told us already in the pretrial order that they're

23  testifying as to the lodestar and as to attorney's fees.  They

24  haven't disclosed themselves as witnesses to this Court

25  considering these summaries.

1          This -- and what I'm saying is, that criteria

2    that you have there is ironclad.  It's in the Fifth Circuit.

3    It's in the Seventh Circuit.  It's in the Sixth Circuit.

4          Plus, they have to be accurate.  From the

5    testimony that we've elicited from the stand right now, some of

6    these numbers are not even accurate.  And if they're not

7    accurate, if they try to extrapolate or to assume these numbers

8    from that, then those summaries themselves are not accurate.

9    And it's got to be -- like I said before, they're not audited.

10   We don't know where they came from, except the fact that they

11   were created.

12         And, Judge, we believe that 15 and 16 are not

13   only not going to be admitted on that, we have a 403 argument

14   to them.  They contain hearsay, especially because, unaudited,

15   we don't know where they came from.  Because, actually, they're

16   not really summaries if you look at it, Judge.  That's actually

17   testimony.  And that's got hearsay in itself, and I don't get

18   to confront the person who prepared it.  That's a Sixth

19   Amendment right.  And that's why that last criteria is listed

20   there:  It must be introduced by the person who prepared it.

21   And there has been no witness introduced into this court to

22   show how that was prepared.  And, if that's the case, I lose my

23   Sixth Amendment right to confrontation as to how that was

24   prepared and its accuracy.

25         The other thing that we've got a problem with is

1    I was given yesterday a new summary by Ms. Howard that they

2    want to substitute in from the one that they've already got

3    admitted into evidence.  I can't check this in one day.

4            THE COURT:  All right.  So you say that the whole

5    thing should stay out; is that right?

6            MR. WILLIE:  I do, Your Honor.

7            THE COURT:  All right.  Anything else?

8            MR. SIUREK:  Just two things, Judge.

9            Going back to the Fifth Circuit requirement, they

10   go on to say -- after the two elements, they go on to say:  "No

11   expert testimony is required where a chart does not contain any

12   complicated calculations requiring an expert for their

13   accuracy."

14           What, again, I'm trying to -- without beating a

15   dead horse -- is math.  There isn't anything in the documents

16   that requires any particular analysis one way or the other.

17           The other thing.  I think I heard a hearsay

18   objection.  I only want to make sure I'm clear.  The charts,

19   summaries, don't contain any hearsay other than some argument

20   that the testimony provided on the witness stand somehow is

21   hearsay; but there's no objection to the testimony coming in as

22   evidence, which is now in the summaries.

23           MR. WILLIE:  That's not my argument, Judge.  I said

24   that document itself is testimony.  But, moreover than that,

25   he's trying to bootstrap this thing that we said once again.

1   There is -- we're not asking for an expert.  The rule says

2   somebody who prepared the document has to testify as to how

3   they prepared it and what their methods are.  That is the

4   last -- that is the last element on that.  And we provided you

5   with a case law on that.

6              There is no testimony in this courtroom -- and he

7   talks about the confrontation -- the calculations are not

8   complicated.  We go just the other way.  If there are errors on

9   here, we need to find out where the errors are.  We've already

10  elicited some errors on the stand.  Once again, here we go.  I

11  mean, but they have not been done.  And when they've got errors

12  in there, he wants to introduce a summary that parrots some of

13  the errors that are in there.  And that's why the rule requires

14  that the person who prepared the summary introduce it.

15          THE COURT:  I don't read the rule to say that the

16  person who prepared the summary has to --

17          MR. SIUREK:  Let me interrupt, Your Honor.  I'm sorry.

18          THE COURT:  Rule 1006 doesn't.

19          MR. SIUREK:  Because it doesn't, Your Honor.  If it

20  was the Sixth Circuit, I might agree with the additional

21  criteria Mr. Willie is discussing.  The case he's describing to

22  you is the Sixth Circuit.  I don't disagree with that, and I

23  think some of our disconnect is with what the legal standard is

24  in the Fifth Circuit.  And the Fifth Circuit does not require

25  the element that Mr. Willie is insisting upon.

1     MR. WILLIE: Every case that he cited, including

2   *Jennings* and *Stephens*, had the preparer of the summary on the

3   stand. Even his cases that he cited to you had the preparer of

4   the summary on the stand because they had to tell the Court

5   and, when it wasn't a bench trial, to the jury how it was

6   prepared so they could judge his credibility. We don't have

7   that here, Judge.

8     THE COURT: Well, here's the thing. I've heard the

9   testimony of the plaintiffs and I have reviewed, although not

10  in detail yet, of course, the voluminous records that have been

11  offered, the service logs. And assuming, as Mr. Siurek

12  represents, that this is a summary of those records and that

13  testimony, I'm going to admit the exhibits and I'm going to

14  give them whatever weight I think they deserve. Because I

15  agree with you, Mr. Willie, these are not completely accurate.

16  There are clearly some discrepancies in the underlying records,

17  and I'm going to take that into consideration.

18     And, so, what we're trying to do, without your

19  clients having kept detailed records of exactly when these

20  people were there at these homes, then the plaintiffs have a

21  burden of approximating their damages by testimony or other

22  records. And I think they are attempting to do that. Whether

23  they have done it to my satisfaction or not, we'll have to see;

24  but I think, under the circumstances, I'm going to admit the

25  exhibits and I'm going to give them whatever weight they

1   deserve after I have compared the summaries with the underlying

2   documents that they're based upon.

3          MR. WILLIE:  And, Your Honor, just for protocol of the

4   Court, can I then just ask for a running objection for those 15

5   or 16 through the balance of trial?

6          THE COURT:  You got it.  Okay.  15 and 16 are in.

7          MR. SIUREK:  Your Honor, by way of explanation, out of

8   an abundance of caution, the summaries were corrected based on

9   the testimony given yesterday so that even the slightest

10  variation is now removed and the 15 and 16 today is the most

11  accurate compilation.  There were a few minor nits based on

12  what the Court asked the witnesses yesterday, so that these are

13  more accurately conformed with the Court's ruling.

14         THE COURT:  And how does that affect the bottom-line

15  numbers for the plaintiff?

16         MR. SIUREK:  It's slightly less for one.

17         THE COURT:  Same for the other, --

18         MR. SIUREK:  Yes.

19         THE COURT:  -- slightly less for one?

20         MR. SIUREK:  Just very, very little.  And, actually,

21  it's a smaller amount based on some testimony from Ms. Howard

22  yesterday.  That's all.

23         THE COURT:  All right.  And Mr. Willie has copies?

24         MR. SIUREK:  Yes.

25         MR. WILLIE:  We got them yesterday, Judge.

1          THE COURT:  Okay.  All right.  Just give them to

2  David.  That will be fine.  He's playing Rhonda this morning.

3  All right.

4          MR. SIUREK:  May I proceed, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. WILLIE:  Excuse me, Judge.  If I'm not mistaken,

7  wasn't Ms. Chapman still on the stand?

8          THE COURT:  I think she was.

9          MR. SIUREK:  And all I was going to say was, given the

10  fact that the Court has admitted 15 and 16, which was my line

11  of questioning with Ms. Chapman yesterday, the plaintiff rests.

12          THE COURT:  Okay.  Plaintiff rests.  So, you want to

13  put Ms. Chapman back on the stand?

14          MR. WILLIE:  I still need to cross her.

15          THE COURT:  Cross her?  Sure.  Absolutely.

16          Ms. Chapman, come back on the stand, please.  All

17  right.  You're still under oath.

18          THE WITNESS:  Oh.  Do I --

19          THE COURT:  You don't need to take it again.  You're

20  still under oath.  Thank you.  It still applies.

21          All right.  Mr. Willie.

22          MR. WILLIE:  If it please the Court.

23          THE COURT:  Mr. Willie.

24      VERA CHAPMAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

25                     RECROSS-EXAMINATION

1   BY MR. WILLIE:

2   Q.  Ms. Chapman, you testified yesterday under oath that you

3   never signed a contract with ASUI; is that correct?

4   A.  No, sir.  I said I can't recall because I signed a lot of

5   papers.

6   Q.  Could you have your testimony read back to you then?

7   A.  Sure.

8          MR. WILLIE:  Does the court reporter have that?

9          THE COURT REPORTER:  Not here.

10  BY MR. WILLIE:

11  Q.  And you also testified yesterday that you did not receive a

12  1099 form or nobody ever talked to you about a 1099 form; is

13  that correct.

14  A.  Yes, sir.

15         MR. WILLIE:  May I approach the witness, Judge?

16         THE COURT:  Yes, sir.

17  BY MR. WILLIE:

18  Q.  I would like for you to look at what's been marked as

19  Defendant's Exhibit C.  It's an ASUI Healthcare Development

20  Center Contract Labor In-Service Orientation Delegation form.

21  A.  Uh-huh.

22  Q.  Okay?  Is that your name on the top of the form?

23  A.  Yes, it is.

24  Q.  Is that your signature on the top of the form?

25  A.  Yes, it is.

1    Q.  Okay.  Could you read to the Court what it says in the

2    outlined summary, please?

3    A.  "Laws governing independent" --

4            THE COURT:  I'm sorry.  We can't hear you.  Speak in

5    the microphone.

6    A.  "Laws governing independent contract -- contractors.  What

7    is a 1099.  Possibility (sic) insurance benefits for the 1099

8    contract."

9    Q.  Finish it, please.

10   A.  "Estimation (sic) for the 1099 contract.  How to file a

11   1099 tax.  Downtime for the independent contract.  Outside

12   insurance vendors for independent contractors."

13   Q.  So, if your testimony yesterday that you never received it

14   nor never received any information from it, that's not entirely

15   true, is it?

16   A.  Yes, sir, I never received a 1099.

17           MR. WILLIE:  Judge, I'd like to admit this as

18   impeachment evidence No. C.

19           MR. SIUREK:  No objection.

20           THE COURT:  All right.  It's admitted.  It's

21   Defendant's C.  You want to make sure to get a copy for the

22   record.

23           MR. WILLIE:  May I approach the witness again, Your

24   Honor?

25           THE COURT:  Yes, sir.

*Chapman - Recross by Mr. Willie*

124

1    BY MR. WILLIE:

2    Q.  Ms. Chapman, I'd like for you to look at what's been marked

3    as Defendant's Exhibit D.

4    A.  Uh-huh.

5    Q.  And it states it is a contract agreement, direct care

6    center.  Does your name appear on it?

7    A.  Yes.

8    Q.  Okay.  Does your signature appear on it?

9    A.  Yes.

10   Q.  Okay.  What's the date that you signed that?

11   A.  1/12/09.

12   Q.  Okay.  Now, this is a contract for employment; is that

13   correct?

14   A.  Yes.

15        MR. SIUREK:  Let me interrupt.  We're pretty far

16   afield on the issue of damages relative to a contract of

17   employment and whether or not this is an independent contractor

18   or an employ --

19        THE COURT:  I agree, that's been established, but I

20   think he's using it for impeachment purposes.

21        MR. WILLIE:  Impeachment purposes only, not for the

22   substance, Your Honor.

23        THE COURT:  All right.  Go ahead.

24   BY MR. WILLIE:

25   Q.  Now, you, in fact, did sign a contract?

1   A.  Yes, sir.

2   Q.  Okay.  And it lays out what the terms of that contract is,

3   doesn't it?

4   A.  Yes.

5   Q.  Okay.

6           MR. WILLIE:  I'd like to offer this as Defendant's

7   Exhibit D, Your Honor, impeachment evidence.

8           MR. SIUREK:  No objection.

9           THE COURT:  D is admitted.

10          MR. WILLIE:  Pass the witness, Judge.

11          THE COURT:  All right.  Thank you.

12              Any redirect?

13          MR. SIUREK:  Nothing further, Your Honor.

14          THE COURT:  All right.  Ms. Chapman, you may step

15  down.  Thank you.

16              All right.  Plaintiffs have rested.

17              Mr. Willie.

18          MR. WILLIE:  Motion for directed verdict, Your Honor.

19          THE COURT:  Go ahead.

20          MR. WILLIE:  First point, as to the personal

21  liability, we do not believe that the testimony that has been

22  elicited pierces the corporate veil.

23              The testimony as to the liability -- personal

24  liability as to Ms. Diann Simien, she is an employee and not an

25  owner of ASUI.  She is the program director of ASUI.  The

 1   corporation is the owner of the business.  There has been no

 2   testimony that's been elicited by the plaintiffs that Ms.

 3   Simien is a direct owner of the business.  There has been no

 4   piercing of the corporal veil under either federal law or state

 5   law.  And we would move that the Court rule that she has no

 6   personal liability as to the claims of the plaintiffs in this

 7   case.

 8           THE COURT:  Ms. Simien?

 9           MR. WILLIE:  Ms. Simien.

10           MR. SIUREK:  Your Honor, I'm consulting with Ms.

11   Haylon because I believe the corporate veil analysis is

12   inapplicable under the Fair Labor Standards Act.  Personal

13   liability attaches under the statute itself for people who have

14   control, manage the work, the criteria that are established in

15   the pleadings themselves.  And I believe that the Court, in its

16   liability finding, has found for the plaintiffs on liability

17   not just for purposes of ASUI but for the individual defendants

18   as well.

19           MR. WILLIE:  And if I remember your order, Judge, you

20   ordered -- the liability issue was that they were the employees

21   of ASUI.  Okay.  You found no personal liability in your order.

22           MR. SIUREK:  I believe if the Court goes to the

23   beginning of the order, you describe collectively the

24   defendants and, at the bottom, you -- in the order itself, Your

25   Honor, I believe the order says the Court finds the defendants

1  are liable.  And I'm talking out of school.  I thought --

2          MS. HAYLON:  Trying to find it.

3          THE COURT:  All right.  I'm going to take your motion

4  for directed verdict under advisement.

5          MR. WILLIE:  Yes, sir.  Secondly, it's the same for

6  Ms. Kim McLemore.

7          THE COURT:  All right.

8          MR. WILLIE:  She is the -- the testimony has been that

9  she's the chief financial officer -- I mean, the chief

10  executive officer of the corporation.

11          THE COURT:  All right.

12          MR. WILLIE:  The only testimony that we have from here

13  was that she was a shareholder, and that was not proven.  And

14  we also would like a directed verdict as to her personal

15  liability.  If anybody is going to be held liable in this case,

16  it would be the corporation, because the testimony that has

17  been elicited so far is that ASUI is a third party

18  administrator for DADS, okay, not in and of themselves.  They

19  do not collect.  The money -- they don't generate the money.

20  The money is sent to them from DADS, and they're the ones who

21  distribute the money as to paying the direct caregivers as well

22  as helping the residents subsidize the rent they have to pay

23  for those homes.

24                  There has been no testimony even elicited in this

25  case that ASUI owns those homes.  The only testimony that has

1   been elicited in this case is ASUI is an agent for the clients

2   who themselves rent the homes.  So, if ASUI doesn't own the

3   homes -- I mean, Ms. McLemore -- doesn't own the homes, she's

4   not generating any money, it's a nonprofit corporation out of

5   the Texas legislature and everything else, even under the Fair

6   Labor Standards Act that Mr. Siurek is quoting and everything

7   else, there is no personal liability to be attached to this.

8              If there's going to be any liability at all, it

9   would be to the corporation who is the third party

10  administrator for the State of Texas.  And with that being the

11  case, we would ask the Court to rule that Ms. McLemore herself

12  does not have any personal liability.

13             THE COURT:  All right.  Mr. Siurek.

14             MS. HAYLON:  Can I jump in, Your Honor?

15             THE COURT:  I'm sorry.  Yes.

16             MS. HAYLON:  Thank you.

17             First of all, the Court has already found they're

18  employees of ASUI in its order.

19             Secondly, the FLSA allows for personal liability

20  for individuals who are deemed employers under the Act.  And

21  for that to be met, all that's required is that you supervise

22  their work and are involved in their compensation.  You don't

23  have to have an ownership interest in the underlying company in

24  order to reach that status.  Supervisors can be liable under

25  the FLSA.

1          The testimony -- there was ample testimony from

2   the verdict (sic) as to Ms. Simien's involvement in setting

3   their rate of pay, setting their schedule, hiring them.  I

4   believe there was even some testimony as to firing Ms. Howard

5   that came in.  So, they were -- and Ms. McLemore, I believe,

6   was making corporate decisions at the corporate level for ASUI.

7          But there is evidence that they were directly

8   involved in the day-to-day operations of ASUI.  They were

9   involved in their hours, their compensation scheme, and their

10  rate of pay.  All of that is necessary to meet their personal

11  liability under the FLSA.

12         MR. WILLIE:  And we would -- and our counter to that

13  is the FLSA is very specific in assigning personal liability

14  even though what she is assigned.  But what she did not forget

15  is you have to have the control over it.

16         She is the program director and has so testified,

17  and there has been no -- and, that is, the program director is

18  there to see for the care, custody, and the safety of the

19  clients.  That is Ms. Simien's job.

20         Ms. Simiens -- Ms. Simien also testified that

21  payroll is handled through a third party payor through Wells

22  Fargo Bank.  So, she has no direct control of the money or how

23  they get paid.  Plus, the money is set and the rate is set, and

24  that's how they were paid for.

25         The discrepancy here is whether or not -- how

1   they were paid.  You've already ruled for the liability.  But

2   as to the personal liability of Ms. McLemore or Ms. Simien,

3   there is no testimony to hold them personally liable that we

4   think, and we think that a directed verdict on that should be

5   issued.

6          THE COURT:  Well, I think it boils down to a control

7   issue.  And I did hear some testimony from the plaintiffs about

8   at least Ms. Simien's degree of control over the schedule and

9   who worked at what house, when, and that sort of thing.  So,

10  I'm going to take -- also take that motion under advisement.

11         MR. WILLIE:  And our last one, Judge, is -- it's a

12  directed verdict on the damages as a whole.

13              There has been no evidence to this Court to

14  accurately reflect what the damages are.  You've got direct

15  service logs.  You've got now the summaries that you have

16  admitted.  The calculations for overtime, by case law, must be

17  specific.  You can't assume them.  You must have reasonable

18  calculations.  And every case that's on this, including one of

19  the ones that you just had, that went up where they affirmed

20  part of it and reversed part of it, says you have to prove

21  those with particularity.  We don't have particularity in this

22  case.

23              You held in your other order that, as a matter of

24  law, they haven't proven their damages calculations because

25  they did them by assumption.  This is, essentially, the same

1   evidence, with only a few minor changes, that they presented on

2   summary judgment.  Instead of having affidavits, they put Ms.

3   Chapman and Ms. Howard on the stand, but the testimony didn't

4   change that much.  And if this is the same exact evidence that

5   they presented to you on summary judgment and this Court held,

6   as a matter of law, that it doesn't cut the mustard, it doesn't

7   cut the mustard now that they testified live on the stand.

8   None of the things are different.

9            And we submit, if they want to rely on this

10   evidence which, essentially, is the same evidence that they put

11   forward to this Court on summary judgment, then they haven't

12   met their damages burden and that the Court should direct a

13   verdict and give the same ruling that it did on summary

14   judgment.

15         THE COURT:  Thank you, Mr. Willie.

16         MS. HAYLON:  Your Honor, the difference between the

17   summary judgment and where we are today is that Mr. Willie has

18   repeatedly argued that the employment records are unreliable,

19   which is the piece that the Court was looking for in the

20   summary judgment, which allows the plaintiff now to give their

21   best estimate of damages under *Mt. Clemens Pottery* case to a

22   fair and reasonable standard.  That's all their burden is at

23   this point.

24         To the extent that the records are in evidence,

25   we rely on the records.  We have also put on evidence that the

1   plaintiffs worked from 2:00 in the afternoon until 9:00 in the

2   morning.  I believe that's uncontroverted.  It's uncontroverted

3   they came off the clock from 10:00 until 6:00.  They worked

4   seven shifts every two weeks.  Their rate of pay is in the

5   records that have been admitted, according to their payroll

6   records.  It's identified on there.  There is ample evidence of

7   their damages, Your Honor.  And they've met the required

8   standard.

9           THE COURT:  I'm going to deny your directed verdict on

10  that.

11          All right.  Anything else?

12          MR. WILLIE:  They rest.  I guess we put on our

13  case-in-chief.

14          THE COURT:  I guess you do.

15          MS. CHAMBERS-GRAY:  We call Diann Simien.

16          THE COURT:  All right.  Ms. Simien.

17          And you are still under oath.

18          THE WITNESS:  Yes.

19              DIANN SIMIEN, DEFENSE WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MS. CHAMBERS-GRAY:

22  Q.  Would you please state your full name for the record?

23  A.  Diann Simien.

24  Q.  Ms. Simien, you've already been sworn.  And I'd like to ask

25  you a few questions about your position at ASUI.  Could you

1    please explain to the Court, who sets the rate of pay for the

2    direct care service providers?

3    A.   It will be a lengthy answer.  Are you wanting me to --

4    Q.   Just explain how that is set.

5    A.   Okay.  First of all, these consumers are mentally

6    challenged.  And, so, prior to them becoming what is called

7    home and community-based services, it's a program that our

8    State Legislature set up in order to transition these

9    individuals from the state school.  They place them in what is

10   called ICF, intermediate care facilities, and home and

11   community-based services, which means you bring them out of the

12   state school, place them into a normal setting in the

13   community, and then teach those individuals life skills, daily

14   life skills.

15            Prior to them -- but they have to qualify for it,

16   and that MHMRA, first of all, does an assessment through a

17   psychologist, does an assessment, and through MHMRA's

18   assessment, they are given a number.  That number represents

19   cognitively -- what level cognitively that these individuals

20   are functioning at.  And, in addition to that, that level also

21   sets the daily rate of pay that is paid for each individual.

22   Each individual's rate of pay is not the same.

23   Q.   Okay.  And, so, who sets the rate of pay?

24   A.   That is done through -- it starts with a psychologist, then

25   MHMRA, then, ultimately, the Department of Aging and Disability

1    Services.

2    Q.  And, so, I take it through your answer that ASUI does not

3    set the pay?

4    A.  We do not set the pay, no.

5    Q.  With regards to Kim McLemore, is her responsibility with

6    ASUI dealing with payroll, hiring, or setting up the pay rates?

7    A.  As the CEO of ASUI, Kim is exactly that.  She is the

8    founder of ASUI.  She did not work in a capacity where she did

9    any of those things.  In fact, Kim is a Ph.D. pharmacist with

10   an income, prior to her stroke of last year, of her own.  So --

11   and she resided in Mobile, Alabama, so there was not that often

12   that Kim would actually be in the office intermingling with

13   workers or consumers.  So, no, Kim did not.

14   Q.  Mrs. Simien, there was some testimony that ASUI began to

15   supervise consumers in 2005.  Would that be correct?

16   A.  That is incorrect.  ASUI opened the day hab, day

17   habilitation center -- which it's not a day care, but it is a

18   place where strictly MR consumers are contracted -- the day hab

19   services, DADS-contracted day hab services, for these

20   individuals to come to the day hab to learn life skills.

21          We didn't actually start the group homes until

22   September 2000 -- the day hab, I'm sorry, was started September

23   2005.  Our group homes were actually opened or was contracted

24   February 2008, with the first group home opening up in March of

25   2008.

1    Q.  And, so, when you opened in 2008, is it your testimony that

2    you were getting direction as to how to manage this agency

3    through the state agency which is your contract through DADS;

4    is that correct?

5    A.  Yes.  Prior to -- DADS has qualifying factors that you must

6    meet in order to be a program manager.  In addition to that,

7    every contracted provider must have a program manager in place.

8              With that said, the program manager must have

9    worked directly with the MR population.  And from remembering

10   correctly, I think it has to be seven to eight years.  You must

11   be degreed.  I have a master's degree in psychology, which was

12   clearly somewhat related to sociology and social services.

13   Therefore, that qualified me to go in and go through the

14   orientation process as well as take a class.  And then a year

15   worth of classwork -- not classwork, but paid a consultant to

16   learn the program in and out, and then went in to be able to

17   converse and take the test and then be qualified as a program

18   manager.

19   Q.  So, when you began to work with the direct care service

20   providers and, in their agreements, there was information about

21   downtime?

22   A.  That is correct.

23   Q.  Were you basing the information that the direct care

24   service providers would not be paid during the downtime based

25   on the information that you received from DADS?

1        MR. SIUREK:  Objection, hearsay.

2        MS. CHAMBERS-GRAY:  Your Honor, I believe that she's

3   testified that she has a contract through ASUI with DADS and

4   DADS was the agency that actually set parameters.

5        THE COURT:  I'll allow it.  I'll allow it for the

6   effect on her, not necessarily for the truth.

7   A.  That is -- I'm sorry.

8        THE COURT:  Go ahead.  You may answer.

9   A.  That is correct, Ms. Gray.  Everything -- DADS, basically,

10  dictates how much money is sent, what that money is to be spent

11  on, how much money is spent on administrative, how much is

12  spent on direct care.  We have what is called a Medicare and

13  Medicaid audit.  And that is exactly what they look at to make

14  sure that none of those funds are taken for our personal use.

15  And, in fact, we're using the money according to how DADS and

16  the contract with DADS states us to do.

17  Q.  So, finally, at any time, were you deliberately trying to

18  not compensate anyone for a job that they actually performed?

19  A.  No, ma'am.  In fact, I compensated for work that hadn't

20  been done.

21  Q.  Because that was the right thing to do?  Is that your point

22  on that?

23  A.  If you bill that you provided particular services and you

24  did not -- I think with the *Riverside* thing, it pretty much

25  breaks it down, the dos and the don'ts of the program, Medicare

1    and Medicaid, what they expect.

2            If you bill on services that were not actually

3    provided, it is considered fraud.  These -- these -- Krystal,

4    for example, is a young woman trying to learn and get -- make

5    it in the work force whichever way she's headed with her

6    future.  To me, it was not -- it should have been -- it could

7    have been a situation that would have been ugly, but it was

8    better for me to just go ahead and pay her.  The company had to

9    take that hit -- and she, among a lot of others -- as opposed

10   to frauding the Government out of federal funds.

11   Q.  So, if someone puts in their logs that they actually worked

12   and when, in fact, they did not, you could be implicated in

13   some sort of crime if there's fraud?

14   A.  If the company makes it good, then that -- it's not a

15   problem at that point.  It's not fraud.  So, if you're asking

16   me -- which I'm going to reiterate this back to you in my own

17   way of understanding of what you're asking me.  If someone says

18   I came in at 3:00 o'clock, the only thing we have to go by is

19   the service delivery log and the begin time and end time.

20           If I came in at 3:00 o'clock, then I'm taking

21   their word for it that this is what they did.  Or if I know

22   that they didn't, then, yes, we go ahead and pay for that and

23   the company -- it comes out of the company pocket.  It can't

24   come out of DADS' money because DADS has already allocated what

25   you can and what you cannot spend and what you can spend it on.

1    Q.  Have you been audited by DADS in the past?

2    A.  Yes, we have.  We're audited yearly by DADS and we're

3    audited every one to two years by Medicare and Medicaid.

4    Q.  And how has the result of those audits --

5    A.  We've made a hundred on all of our audits.

6            MS. CHAMBERS-GRAY:  I have no further questions.  I'll

7    pass this witness, Your Honor.

8            THE COURT:  Thank you.

9            MR. SIUREK:  Just a few.

10           THE WITNESS:  Yes, sir.

11                        CROSS-EXAMINATION

12   BY MR. SIUREK:

13   Q.  Ms. Simien.

14   A.  Yes, sir.

15   Q.  I think there was some questions about setting a rate.

16   A.  Yes, sir.

17   Q.  Does ASUI get a daily rate per client?

18   A.  There is a daily rate that is given by DADS through MHMRA

19   and the psychologists' assessments that determines what rate.

20   And rate meaning, DADS talks about it in terms of level of

21   need.  The rate is the level of need, and that means how much

22   does it take, how much work does it take, to assist or

23   supervise that this consumer or client is going to need on a

24   daily basis.  And, yes, on a daily basis, based on the level of

25   need, a rate is assigned to that -- rate of dollar amount is

1   assigned to that level of need.

2   Q.  All right.  So, yes, there is a daily rate assigned to each

3   of the clients?

4   A.  Through DADS, that is correct.

5   Q.  And give the Court a range of what that daily rate is.

6   A.  I have no idea.  I don't have that in front of me.

7   Q.  You don't know how --

8   A.  It would depend -- and I'm not trying to be smarty here.

9   I'm trying to help him understand what I'm saying.  It would

10  depend on the level of need, the level of need being -- has a

11  No. 1 been assigned to that individual?  No. 1 is minimal

12  amount, minimal amount.  Or a Level 8 or, let's say, a 6, which

13  would be a little bit more critical.  So, that would be a

14  higher dollar amount.  And I don't remember those numbers right

15  off my head.

16  Q.  And, to be clear, ASUI gets a daily rate for a client and,

17  then, based on that daily rate they get, they determine how

18  much direct --

19  A.  They who?  They who determines?

20  Q.  ASUI.

21  A.  No.  That is not what I said.  At the time that the

22  individual comes -- if I'm understanding you correctly -- at

23  the time that the individual comes into the program, that has

24  already been done when they get -- when the consumer or the

25  client gets to ASUI.

1  Q.  Are you telling this Court that somebody at the State of

2  Texas told ASUI to pay Ms. Chapman 7.25 an hour and told ASUI

3  to pay Ms. Howard 8.50 an hour?

4  A.  I think that when they extended the contract to ASUI, your

5  managerial skills and everything else had to be there; and, so,

6  with common sense, I can't pay someone $20 an hour if I'm only

7  getting $3 an hour.  And that's just a matter of speaking for

8  that individual for that day.

9  Q.  So, you get to pick?

10 A.  No, sir, I don't.

11 Q.  All right.  To summarize, you get a day rate for a client

12 from the State of Texas, correct?

13 A.  Yes.

14 Q.  And the direct caregivers are not paid a daily rate,

15 correct?

16 A.  Okay.  We're talking about a daily rate for the consumer or

17 are we now talking about what they're paid a day for their

18 services?

19 Q.  I'm asking you about the quantum of money that ASUI

20 receives per client per day.  They receive a sum of money,

21 correct?

22 A.  I don't -- they receive moneys for those individuals not

23 every day.  The money is sent once a week and is

24 direct-deposited into ASUI's account.  Prior to those

25 individuals coming, the consumers coming into the agency, we

1  sit down with MHMRA:  This is what their level of need is, this

2  is what their daily care is going to be, this is what we're

3  going to pay for this individual on a daily basis, this is what

4  DADS is going to pay on a daily basis.

5  Q.  Let me try a different way.

6  A.  Okay.

7  Q.  The money goes into ASUI's account.

8  A.  That is correct.

9  Q.  Ms. Chapman gets hired by ASUI.

10  A.  Uh-huh.

11  Q.  Because they write her a check, right?

12  A.  Correction.  Ms. Chapman -- my job as a program manager --

13  wait a minute.  You asked me.  You made the statement, so I'm

14  clarifying this for you.

15  Q.  Yes, ma'am.

16  A.  ASUI -- I'm responsible to ensure the health and safety of

17  the consumer.  So, if Ms. Chapman comes in and she's wanting a

18  contract to work in the group homes with the consumer, the only

19  part I play in that is that I ensure that a criminal background

20  check has been done.  I ensure that letters of references have

21  come in and what is being said about the character of this

22  individual.  Okay?  And from that point, it is actually the

23  consumer who chooses who they want and do not want working in

24  their home.  It is their home.  So, with that said --

25  Q.  You hire Ms. Chapman?

1  A.  The consumer hires Ms. Chapman.

2  Q.  These are mentally impaired people.

3  A.  That is correct.  And that is their right.  If I do it any

4  other way, it is considered violating their rights.  And this

5  is all written.  So, if you need this information, I have no

6  problems giving that to you.

7  Q.  No, ma'am.

8  A.  Okay.

9  Q.  I think the question is, we're still at the point where

10  you're hiring --

11  A.  I didn't hire Ms. Chapman.  The consumer did.  Even when

12  the paperwork is given to me, and I must by law, according to

13  your State Legislature, meet with that consumer and the

14  consumer asks questions of whatever they want to know about

15  that individual, and they say yea or nay.

16          THE COURT:  This is a mentally retarded individual?

17          THE WITNESS:  Yes, sir.  And I stated earlier, a lot

18  of these consumers are -- I don't know if I stated it in here.

19  They are high-functioning.  Some even go to San Jac.  They're

20  not what -- that's one of the things about this population.

21  They're very, very misunderstood.  All MR consumers are not

22  low, low, low functioning.  They may have Downs Syndrome.

23          THE COURT:  I think I understand.

24          THE WITNESS:  Okay.  Okay.

25  BY MR. SIUREK:

1    Q.  Just to be clear --

2    A.  Okay.

3    Q.  -- you have testified under oath in your deposition --

4    A.  That is correct.

5    Q.  -- that these -- these clients cannot by law enter into a

6    contract?

7    A.  Your State Legislature states that.

8    Q.  So, you're telling us, or you've told me before, they can't

9    enter into a contract, but you're telling the Court today that

10   the client picks or chooses or contracts which direct service

11   giver they want?

12   A.  That is correct, sir.  And let me explain to you why.  My

13   job as the program manager --

14   Q.  Let me interrupt you.

15          THE COURT:  Ma'am, just answer his question.

16          THE WITNESS:  Okay.

17   BY MR. SIUREK:

18   Q.  At this point, I'm going to have to start objecting to

19   responsiveness.

20   A.  That's fine.

21   Q.  If we can, let's just try to -- I just want to finish this

22   line of questioning, ma'am, and then I'll stop.

23              Let's say with Ms. Chapman, each of the clients

24   in her house gets a daily rate for -- from the State to ASUI

25   for their care, correct?

1   A.   And I'm trying to answer this as honestly as I can.   I'm

2   under oath, so I can't mislead you.   I just have to state the

3   way that it is, counselor.

4                  If there's a ghost in that house and that ghost

5   is coming to work in that house and the consumer has accepted

6   them, the daily rate has been in there.   It doesn't matter who

7   comes into that home.   The daily rate has already been set.

8   And not by me.

9           MR. SIUREK:   I pass the witness.

10          THE WITNESS:   Okay.

11          THE COURT:   All right.   Let me try.

12          THE WITNESS:   Yes, sir.

13          THE COURT:   The State provides a certain amount per

14  consumer per day?

15          THE WITNESS:   That is correct, Your Honor.

16          THE COURT:   All right.   And that comes -- for the

17  consumers that you manage in group homes, that comes to ASUI

18  into your bank account, correct?

19          THE WITNESS:   That is correct, Your Honor.

20          THE COURT:   All right.   And, so, if we have three

21  individuals -- and the maximum is three in a group home, right?

22          THE WITNESS:   That is correct.

23          THE COURT:   All right.   So, you have three

24  individuals, mentally retarded individuals, in a group home?

25          THE WITNESS:   Yes, sir.

1        THE COURT:  So, there are three pots of money coming

2    from the State?

3        THE WITNESS:  Three different rates.

4        THE COURT:  For each of those individuals -- it may be

5    different rates.

6        THE WITNESS:  Yes, sir.

7        THE COURT:  Although, my guess is that you probably

8    try and keep individuals of the same functioning level together

9    in a group home?

10       THE WITNESS:  That is correct.

11       THE COURT:  All right.  So, the pots of money would be

12   roughly the same for each of the three?

13       THE WITNESS:  Almost the same.

14       THE COURT:  All right.  And then you determine, or

15   ASUI determines, I assume, based upon this pot of money and

16   what the rent is for the house and other expenses, what you can

17   pay the direct caregivers who work in the homes; is that right?

18       THE WITNESS:  The rent is not included in that.  It is

19   direct care alone.  That's --

20       THE COURT:  So, the rent is something different?

21       THE WITNESS:  And, so, we calculate it out for each

22   individual, since we try to keep most likes alike, and it is

23   divided between three individuals and then we divvy out between

24   the three -- the two individuals or three individuals who --

25   however many worked in the home.

1       THE COURT:  But that is how you set the pay rate for

2   the direct caregivers.  I mean, it's not the State that tells

3   you you have to pay 7.25 or 7.50 to these folks.  You base that

4   on the pot of money that you have available?

5       THE WITNESS:  Basically, they do set it because if

6   there's --

7       THE COURT:  It's not basically.  I mean, I want to

8   know --

9       THE WITNESS:  They do set it, then.  Let me explain

10  it.

11      THE COURT:  They told you what to pay these people?

12      THE WITNESS:  They tell you -- they give you the

13  amount of money that is given for those three individuals.

14      THE COURT:  Right.

15      THE WITNESS:  Now, you have no more or no less.  If

16  you have that amount of money to pay those three individuals

17  and once each individual is paid equally, then that's all you

18  have.  So, they basically give the money, all the money that

19  you have to pay for those individuals in that home, and you

20  have to pay the individuals in there.  So, you only have what

21  you have to pay with.  You pay them equally.  The consumers'

22  level of need is equal.  So, you divide that between those

23  individuals, and that's what you have.

24          So, basically, they've set it.  If there were

25  more, I would give more.  If there were less, I would have to

1    give less.

2          THE COURT:  Do the caregivers have different

3    experience levels and different educational levels so that not

4    every caregiver gets exactly the same amount?

5          THE WITNESS:  There has never been a caregiver who has

6    come in with a high school diploma or experience in that area,

7    and HCS is different.  So, everyone starts out at the same

8    until they learn how to work with the MR population or

9    demonstrate that they've mastered that.  And that is knowing

10   how to deal with behaviors, knowing how to give the --

11   administer the medications, knowing how to do whatever.  No one

12   has come in the door with that experience, because this program

13   is one of its own.

14          If you have what's called a CNA, that doesn't

15   help in this particular case.  CNA doesn't apply or is needed

16   in this line of work, working with the MR population in the

17   setting that we're working with them in.

18          THE COURT:  All right.  I'm still not clear on who

19   sets the rate.

20          THE WITNESS:  DADS sets the rate.

21          THE COURT:  DADS?

22          THE WITNESS:  Because if DADS -- if DADS sent me

23   $500,000 for that week to pay to those individuals in that home

24   for these three consumers, then that $500,000 would have to be

25   divided among the three in that home.

1          THE COURT:  But you do the math.  You take that pot of

2    money and you divide it by the number of employees that you

3    have and then you set their rate of pay?

4          THE WITNESS:  The reason that --

5          THE COURT:  Now, wait.  Just a second.  Is that right?

6          THE WITNESS:  No, sir.  No, sir, it's not.

7               What happens is, there's one bank account that

8    DADS direct-deposit into.  Okay?  So, DADS -- that's why they

9    contracted with us.  They're not going to sit there and divide

10   up the money for us.  What they do say is, this is the amount

11   of money that's being paid for these three consumers.  And when

12   the money comes into the bank, direct-deposited, we know how

13   much we can spend on those individuals working in that home.

14   So, the money is there.  You get it out -- you cut the check,

15   or direct deposit, and you give them their money.

16               We, basically -- we're the -- we're the -- we're

17   the parking for DADS, so to speak.  DADS says, "At this time we

18   need you to do this, we need you to do that."  And, so, they

19   provide -- they provide the funds.  We provide the services.

20          THE COURT:  Right.  But my question is:  Once you have

21   that pot of money from DADS for the individuals that you have

22   in the group homes and you know how many employees you have and

23   what hours they're working, then you've got to do the math to

24   know what you can pay these people?

25          THE WITNESS:  No, sir.  You're not understanding me.

1          THE COURT:  I'm not understanding.  No, I'm not

2    understanding you.

3          THE WITNESS:  Let me try to put this -- I guess if you

4    -- DADS already initially, prior to that consumer coming into

5    the group home, has -- let me back it up a little bit.  Maybe

6    it will be a little bit clearer.

7               Prior to a consumer being placed with a provider,

8    the consumer selects what provider they want to go to.  Then

9    MHMRA or the guardian, if they have a guardian, if they've

10   chosen -- it's their choice -- if they've chosen ASUI and we

11   can meet the needs of that consumer, then we meet.  Prior to

12   that consumer even coming into the door, we meet.  We know

13   the -- we discuss the level of need.

14              And we're saying level of need, but the level of

15   need is the money.  Okay?  So, if you look at it in those

16   terms, they've already told us, prior to them even coming into

17   the group home, they've been assessed at this, the level of

18   need is this, and DADS pays this for this consumer.  Okay?  So,

19   everything has already been set at that point.

20              So, once they come into ASUI, with us having been

21   given all the information and the dollar figures, once that

22   money is direct-deposited -- and this is one of the things that

23   Medicare and Medicaid audited us on.  Are you paying what

24   you're supposed to be paying for these individuals and no less?

25   You can pay more if you want to, but no less.

1          And, in addition to that, not only do I get paid

2     a salary, if I were receiving a salary, the company does as

3     well.  The agency can only make 10 percent.  So, they have a

4     cap on that, even.  The agency works for DADS, your State

5     Legislature, and there's a cap on that.

6          So, however the idea is that all this money is

7     floating around for this social -- it's a social welfare

8     program, that is not correct.  That perception is not correct.

9     Everything has a dollar amount on it and a limited cap on it

10    and you operate ASUI, the agency, under those guidelines.

11          So, I hope I've answered your question.  When

12    we -- the consumer comes into ASUI, even prior to them coming

13    into ASUI, DADS already up front -- everything is set, is

14    there.  And, no, we do not determine the pay.  DADS does.  They

15    determine that at the very beginning through the -- to call the

16    level of need, which has been assessed through MHMRA and a

17    psychologist and accepted as this is the case with DADS.

18          THE COURT:  All right.  We're talking apples and

19    oranges.  You're explaining the process by which DADS

20    determines the level of need for a consumer on a daily basis.

21    I understand that.

22          THE WITNESS:  Your Honor, let me try to use the right

23    words, then.

24          The assigned dollar amount through DADS on a

25    day-to-day basis for that consumer, ASUI does not determine

1   that.  We have no say-so in that.

2          THE COURT:  Nobody, as far as I can tell in this

3   courtroom, is saying that you determine that.  What we're

4   trying to get at is the rate of pay for the individuals who

5   work in the group homes and provide the services.

6          THE WITNESS:  Your Honor --

7          THE COURT:  I think what --

8          THE WITNESS:  Go ahead.

9          THE COURT:  I think what you're saying is that, based

10  upon the money that comes with these individuals from DADS,

11  that's how you determine the rate of pay because that's all the

12  money you've got.  You've got a pot of money and you have to

13  divide it up among the caregivers.

14         THE WITNESS:  Let me try to go back and make it clear.

15         THE COURT:  Let me just ask:  Is that right?

16         THE WITNESS:  No, sir.  Not all the way right, no.

17         MR. WILLIE:  If I may, Your Honor, I think I can

18  facilitate your answer and Mr. Siurek so we can't go around

19  with this circle.

20                      REDIRECT EXAMINATION

21  BY MR. WILLIE:

22  Q.   There is an employment contract -- not offered for the

23  substance, but there's an employment contract that says they

24  start out at 6.25 an hour and then they move to 7.25 an hour.

25  That is set by ASUI, is it not?

1    A.   They start out at 7.25 an hour, and that is set by ASUI.

2              THE COURT:  There we go.  There we go.  Voila.

3    Incredible.  That's all we were trying to get to.

4              THE WITNESS:  But he was asking me about all this

5    other stuff.

6              THE COURT:  No, we weren't.

7              THE WITNESS:  Okay.

8              THE COURT:  No, we weren't.

9              THE WITNESS:  Okay.  Well, I misunderstood.  I'm

10   sorry.

11             THE COURT:  I used to sit on the MHMRA Board.

12             THE WITNESS:  Okay.

13             THE COURT:  And I sat on the State Board of Mental

14   Health and Retardation.  I understand this stuff, I think.  Or

15   I thought I did.  I'm not sure I do anymore.

16             All right.  One more -- couple more questions.

17   With respect to the group homes, how many group homes does ASUI

18   operate?

19             THE WITNESS:  We have 13 group homes.

20             THE COURT:  13 group homes?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  All right.  And those are residential

23   facilities, correct?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  With a maximum of three individuals in

1   each --

2           THE WITNESS:  That is correct.  Some have three.  Some

3   have two.  Some, they only have one.  That is correct.

4           THE COURT:  All right.  And who contracts -- these are

5   primarily homes or condos or apartments?

6           THE WITNESS:  They're all homes.

7           THE COURT:  All homes?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Who rents these homes to establish the

10  group homes?

11          THE WITNESS:  DADS states that the program manager,

12  ASUI, or a representative from the agency -- that would be me,

13  the program manager -- goes out and look for a home, take the

14  consumer to see the home, the consumer says yes or no, and if

15  the consumer says, "Yes, this is a home I want to live in," I

16  have to enter into that contract for that consumer.  DADS does

17  not allow the consumer to enter into any contract in order to

18  avoid them being exploited.

19          THE COURT:  Okay.  Thank you.

20              Anything else?

21          MR. SIUREK:  Nothing further, Your Honor.

22          THE COURT:  Either party want to ask questions based

23  on what I asked?  Ms. Gray?

24          MS. CHAMBERS-GRAY:  Nothing further.

25          THE COURT:  Nothing further?  Okay.  You may step

1    down, Ms. Simien.  Thank you.

2            Anything else, Mr. Willie?

3            MR. WILLIE:  Real short, Your Honor.  We call Ms.

4    Krystal Howard for just some short questions.

5            THE COURT:  All right.  Ms. Howard.

6            You are still under oath, Ms. Howard.

7            THE WITNESS:  Yes, sir.

8        KRYSTAL HOWARD, DEFENSE WITNESS, PREVIOUSLY SWORN

9                    DIRECT EXAMINATION

10   BY MR. WILLIE:

11   Q.  Good morning, Ms. Howard.

12   A.  Good morning.

13   Q.  Do you remember when you testified yesterday --

14           MR. WILLIE:  Excuse me, Judge.  Since this is on my

15   case-in-chief, this is an opposing witness and I'd like to be

16   able to lead her, too, if possible?

17           THE COURT:  All right.  I'll allow you to ask leading

18   questions.

19   BY MR. WILLIE:

20   Q.  Do you remember yesterday you testified on the stand that

21   you hadn't signed a contract with DADS?  You remember that?

22   A.  I said I wasn't for sure.

23           MR. WILLIE:  May I approach, Your Honor?

24           THE COURT:  Yes, sir.

25   BY MR. WILLIE:

1  Q.  I have here what is marked Defendant's Exhibit E.  That's a

2  contractual agreement, direct care service.  Does it have your

3  name, Krystal Howard?

4  A.  Yes, sir.

5  Q.  Okay.  Does it have your signature on there?

6  A.  It looks like my signature.

7  Q.  Okay.  And what date is it signed?

8  A.  9/19/08.

9  Q.  Okay.

10      MR. WILLIE:  I'd like to introduce this, Your Honor,

11  for impeachment purposes only as Exhibit E.

12          THE COURT:  Exhibit E.

13          MR. SIUREK:  I just need to look at it.

14          THE COURT:  Sure.

15          MR. SIUREK:  I have no objection, Your Honor.

16          THE COURT:  All right.  Exhibit E is admitted.

17  BY MR. WILLIE:

18  Q.  And yesterday you also testified that you said you had

19  never seen a 1099 form, had never been informed of a 1099 form,

20  and that you had never been explained to what that was.  Do you

21  remember that testimony?

22  A.  I did not say that.  You did not ask me about a 1099 form

23  yesterday.

24  Q.  Yes, I did.

25          MR. WILLIE:  And I'm going to approach again.

1          THE COURT:  Sure.

2   BY MR. WILLIE:

3   Q.  This says "ASUI Healthcare Development Center Contract

4   Labor In-Service Orientation and Delegation."  Is that your

5   signature?

6   A.  No.

7   Q.  You're under oath.

8   A.  That's not my signature.  I know how I write, sir.

9   Q.  Okay.

10          MR. WILLIE:  I have no further questions, Your Honor.

11          THE COURT:  All right.  Thank you.

12              Anything?

13          MR. SIUREK:  Nothing for this witness, Your Honor.

14          THE COURT:  All right.  You may step down.

15          MR. WILLIE:  Your Honor, may I approach?

16          THE COURT:  Yeah.  Come on.  Mr. Siurek.

17      (At the bench:)

18          THE COURT:  All right.  Go ahead.

19          MR. WILLIE:  This last witnesses has committed

20   perjury.  Now, I don't know --

21          THE COURT REPORTER:  I can't hear.

22          THE COURT:  You have to speak up.

23          MR. WILLIE:  Okay.  I think this last witness has

24   committed perjury as to her testimony.  That is her signature.

25   It's the same as all the rest of them, and she didn't haven't

 1    any problem on all the rest of them.  Now, if I'm forced to, I

 2    will go get these documents; but she has committed perjury.

 3    And if she's committed perjury, her credibility is really at

 4    issue.

 5             THE COURT:  You know, you asked her if that's her

 6    signature.

 7             MR. SIUREK:  And she said no.

 8             MR. WILLIE:  I will go get it, Judge, I will be back

 9    in here.

10             MR. SIUREK:  I don't know how to respond to that, Your

11    Honor, except we are in the middle of a trial and she's

12    testified that that's not her signature.  If there's something

13    he wants to show the witness to --

14             MR. WILLIE:  She can deny under oath.  But if it's

15    proven later under oath that she has lied, I'm just letting you

16    know right now for your -- I will be coming back in here and I

17    will be asking the Judge to cite her for perjury.

18             THE COURT:  Okay.  All right.

19             MR. SIUREK:  Very well.

20        (Conclusion of bench discussion)

21             MR. WILLIE:  Defense rests.

22             THE COURT:  Defense rests.  All right.

23                 Any rebuttal case?

24             MR. SIUREK:  Yes, Your Honor.  Given the fact that

25    there's been -- Kim McLemore's responsibilities and involvement

1   in terms of her personal liability in this case has been put in

2   issue, the plaintiffs call the defendant, Kim McLemore.

3            THE COURT:  All right.  I think that's appropriate.

4                 Ms. McLemore.

5            MR. WILLIE:  She's not present, Your Honor.  And the

6   reason she's not present is because she is physically incapable

7   of testifying.  Ms. McLemore has had a stroke.  As a matter of

8   fact, has had two strokes.  That's the reason that he didn't

9   even get a chance to finish her deposition and everything else.

10  And she's currently on bed rest right now because, as I

11  understanding it, she is pregnant?

12           MS. SIMIEN:  Yeah.  I spoke with her doctor on

13  yesterday.  She is pregnant.  She's a high-risk pregnancy.  The

14  doctor, under no circumstances, felt that she is able to do

15  this.

16           MR. WILLIE:  And, so, I mean, the witness is

17  unavailable.  And there was no complaint when we started this

18  trial that Ms. McLemore's presence wasn't needed.  And his

19  rebuttal -- what is there to rebut?  They have testified as to

20  what they think Ms. McLemore's job is.  Ms. Simien has

21  testified as to what she thought Ms. McLemore's job is.  He's

22  not risking anything.

23           THE COURT:  All right.  Don't you -- I mean, what they

24  thought her job is and what Ms. Simien thought her job was, the

25  best person to say what her job was is Ms. McLemore.

1          MR. WILLIE:  But they could have called her in the

2     case-in-chief, Judge.

3          THE COURT:  Was she available yesterday?

4          MR. WILLIE:  She wasn't available yesterday, nor did

5     he ask for her.

6          THE COURT:  Then how could they have called her in

7     their case-in-chief if she wasn't available yesterday?

8          MR. WILLIE:  What I'm saying, Judge, he waits until

9     the end of rebuttal -- I mean, to the end -- after the

10    defendant has closed -- please -- he waits until the end of the

11    case.  He's rested.  That means that he needs no more direct

12    evidence for any of the witnesses on his witness list.

13    That's -- I mean, that's what he's saying.  We have put on our

14    case-in-chief with two witnesses -- with recalling one witness,

15    finishing up with Ms. Simien, and then that's it.

16          What rebuttal does he need as to Ms. McLemore's

17    testimony?  There is -- it's stipulated.  There is nothing

18    that's here before the Court that she is the CFO -- I mean,

19    she's the CEO.  Nobody has contradicted that fact.  There's

20    been no contradictory testimony to that fact.  There is nothing

21    to rebut that, Judge.  That's what I'm saying.

22          If there was something -- if we had testified

23    that Ms. McLemore was somehow not involved with the corporation

24    or didn't do this or had no duties, then he would have

25    something to rebut, but there has been nothing here to rebut.

1    She's the CEO.  And it's up to this Court to decide whether, in

2    her position as the CEO, whether she has personal liability or

3    not.  And you've already said you'd take that under advisement

4    and, if you find that she does have personal liability, that's

5    what you can so hold; if you find that she doesn't, that's what

6    you can so hold.  But as to any -- there's nothing to rebut.

7    That's what I'm trying to say, Your Honor.

8         THE COURT:  Well, I bet Mr. Siurek is going to tell us

9    what he wants to rebut.

10        MR. SIUREK:  And I respectfully disagree, Your Honor.

11   I think we all heard from Ms. Simien that she had no

12   involvement, she lived in Alabama.  All of these things I've

13   heard for the first time on the witness stand about the fact

14   that there's some -- that there is limited involvement on the

15   part of the CEO.

16        One other point that I didn't raise with the

17   Court and I wasn't going to raise until the issue was put

18   forward.  The reason I didn't get to finish her deposition, we

19   have a certificate of nonappearance from Ms. McLemore.  I

20   wanted to take her deposition, and she didn't show up.  So, I

21   wasn't able to preserve that testimony or get it for purposes

22   of trial.  So, given the fact it's now an issue, I am forced to

23   call her as a witness.

24        THE COURT:  Whereabouts is she?  Is she in Houston or

25   is she out of town?

1          MR. WILLIE:  Where is she?

2          MS. SIMIEN:  She's in Mobile, Alabama.

3          MS. CHAMBERS-GRAY:  Possibly, could the Court consider

4     maybe a telephone --

5          THE COURT:  All right.  Why don't we take a break and

6     you discuss it and see if that might be a reasonable

7     alternative to get her on the phone and, perhaps, get her

8     testimony that way, because I assume it's going to be

9     relatively short.

10         MR. SIUREK:  It is.

11         THE COURT:  And why don't you talk about that?  I'll

12    give you -- let's take 15 minutes.

13         MR. SIUREK:  Yes, Your Honor.

14         THE COURT:  Good.  Thank you.  There's no rebuttal

15    case other than that, I take it?

16         MR. SIUREK:  Other than that, Your Honor, that's all.

17         THE COURT:  Good.  Thank you.

18       (A recess was had.)

19         THE COURT:  All right.  Where do we stand with respect

20    to Ms. McLemore?

21         MR. SIUREK:  Your Honor, given the circumstances I've

22    discussed with Mr. Willie and the fact that Ms. McLemore,

23    apparently, has some serious medical issues, including bed rest

24    for a high-risk pregnancy, I think -- also given the fact this

25    is a bench trial -- we are inclined to just rest on the

1    evidence that we have.

2              Now, what I will say --

3         MR. WILLIE:  And I'll speak to that.  With the

4    proviso --

5         MR. SIUREK:  With the proviso.

6         MR. WILLIE:  -- as officers of the Court, that he gets

7    to talk to the high-risk doctor, which we're getting on the

8    phone outside, so he can fully explain to him her condition.

9    And I think that's only fair for him.

10             THE COURT:  That sounds reasonable to me.

11             MR. SIUREK:  And then, that way, with that we will

12   rest.

13             THE COURT:  Okay.  All right.  So, you can get the

14   doctor on the phone and, at that point, you'll determine

15   whether or not, I assume, you're going to rest?

16             MR. SIUREK:  I presume -- yes, I presume it's going to

17   be confirmation, Judge.  With that, we can assume that we are

18   resting for purposes of what comes next.

19             THE COURT:  Okay.  All right.  Now, with respect to

20   what comes next, you have submitted, Mr. Siurek, proposed

21   findings of fact and conclusions of law.

22             MR. SIUREK:  We have.

23             THE COURT:  I assume you're going to do the same?

24             MR. WILLIE:  I didn't know how the evidentiary rulings

25   were going to be today, but I have it ready.  So, as soon as I

163

1   get back to the office, it will be right back to you.

2          THE COURT:  Okay.  Did you submit yours

3   electronically?

4          MR. SIUREK:  We did.  We filed them.

5          MR. WILLIE:  And I will do mine electronically, Your

6   Honor.

7          THE COURT:  All right.  Very good.

8               Does either side want to do any final briefing on

9   the claims?

10          MR. SIUREK:  May I ask a question, Judge?  Would the

11   Court welcome a little post-trial brief?

12          THE COURT:  I would.

13          MR. SIUREK:  The answer is yes.

14          MR. WILLIE:  Yes, sir.

15          THE COURT:  I would.  All right.  Time frame?

16          MS. HAYLON:  The record, I suppose.  I don't know that

17   we need --

18          MR. SIUREK:  No.  I don't -- I don't think we need the

19   record.

20          MS. HAYLON:  No.  We'll just do the law then.  Ten

21   days?

22          THE COURT:  Two weeks.

23          MR. SIUREK:  We will.

24          THE COURT:  Two weeks, both sides, submit

25   simultaneous.

164

1          MR. WILLIE:  Simultaneous.

2          THE COURT:  Yeah.  I don't want to go back and forth

3   on this.  So, if you'll both just submit simultaneously in two

4   weeks, then we will be done.

5          MR. WILLIE:  Yes, sir.

6          MR. SIUREK:  Very well.

7          THE COURT:  All right.  Thank you very much.

8          MR. SIUREK:  Are we excused?

9          THE COURT:  Yes, you are.  Everybody is excused.

10       (Concluding at 10:43 a.m.)

11

12   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
     RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, TO THE BEST
13   OF MY ABILITY.

14                                        3/22/13

15   _____        _____
     ANITA G. MANLEY
16   OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25